Slip Op. 14-150

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **ELKAY MANUFACTURING COMPANY**,<br><br>    Plaintiff,<br><br>v.<br><br>**UNITED STATES**,<br><br>    Defendant,<br><br>    and<br><br>**GUANGDONG DONGYUAN KITCHENWARE INDUSTRIAL COMPANY, LTD.**,<br><br>    Defendant-intervenor. | **Before: Timothy C. Stanceu, Chief Judge**<br><br>**Consol. Court No. 13-00176** |

## OPINION AND ORDER

Dated: December 22, 2014

[Remanding a determination by the U.S. Department of Commerce in an antidumping duty investigation for reconsideration of two aspects of the calculation of the normal value of imported merchandise]

*Joseph W. Dorn* and *P. Lee Smith*, King & Spalding LLP, of Washington D.C., for plaintiff and consolidated defendant-intervenor Elkay Manufacturing Company.

*Gregory S. Menegaz, J. Kevin Horgan*, and *John J. Kenkel*, DeKieffer & Horgan, PLLC, of Washington D.C., for consolidated plaintiff and defendant-intervenor Guangdong Dongyuan Kitchenware Industrial Company, Ltd.

*Patricia M. McCarthy*, Assistant Director, and *Richard P. Schroeder*, Trial Attorney, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, of Washington D.C., for defendant United States.  With him on the brief were *Stuart F. Delery*, Assistant Attorney General, and *Jeanne E. Davidson*, Director.  Of counsel on the brief was *Whitney M. Rolig*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Stanceu, Chief Judge: In this consolidated action, plaintiffs Elkay Manufacturing

Company ("Elkay") and Guangdong Dongyuan Kitchenware Industrial Company, Ltd.

("Dongyuan") contest a determination ("Final Determination") that the International Trade

Administration, U.S. Department of Commerce ("Commerce" or the "Department") issued upon

the affirmative conclusion of an antidumping duty investigation of drawn stainless steel sinks

("subject merchandise") from the People's Republic of China ("China" or the "PRC").  Both

plaintiffs challenge aspects of the Department's calculation of the normal value of subject

merchandise.[1]

Dongyuan, a Chinese manufacturer and exporter of stainless steel sinks and one of the

two producer/exporters that Commerce investigated individually, challenges the Department's

use of import data from Thailand to determine a surrogate value for the cold-rolled stainless steel

coil that Dongyuan used as the primary material in producing subject merchandise.

Compl. ¶ 11-15 (June 12, 2013), ECF No. 9 (Court No. 13-00199) ("Dongyuan Compl.").

Elkay, a U.S. producer and the petitioner in the investigation, challenges the Department's

method of accounting for selling, general, and administrative ("SG&A") expenses in the normal

value determinations for the two individually-investigated producer/exporters.[2]  Compl. ¶ 11-14

(June 5, 2013), ECF No. 14 ("Elkay Compl.").

---

[1] Each plaintiff is also a defendant-intervenor in this consolidated action.  Order
(June 28, 2013), ECF No. 16 (Ct. No. 13-00199) (granting Elkay's Mot. for Intervention); Order
(July 9, 2013), ECF No. 21 (granting Dongyuan's Mot. for Intervention).

[2] In its complaint, Guangdong Dongyuan Kitchenware Industrial Company, Ltd.
("Dongyuan") also challenged the valuation of Dongyuan's brokerage and handling expenses by
the U.S. Department of Commerce ("Commerce" or the "Department").  Compl. ¶ 16-17
(June 12, 2013), ECF No. 9 (Ct. No. 13-00199).  Because this claim is omitted from Dongyuan's
Rule 56.2 motion, *see* Dongyuan's Rule 56.2 Mot. for J. Upon the Agency R. (Oct. 21, 2013),
ECF No. 27, the court considers it abandoned.  *See* USCIT R. 56.2(c)(1)(B).

Before the court are Dongyuan's and Elkay's motions for judgment on the agency record pursuant to USCIT Rule 56.2.  Elkay's Mot. for J. on the Agency R. (Oct. 21, 2013), ECF No. 26 ("Elkay Mot."); Dongyuan's Rule 56.2 Mot. for J. Upon the Agency R. (Oct. 21, 2013), ECF No. 27 ("Dongyuan Mot.").  Also before the court is a request by defendant United States for a partial voluntary remand to allow Commerce to reconsider the use of the Thai import data for determining a surrogate value for cold-rolled stainless steel coil.  Def.'s Resp. to Pl.'s Rule 56.2 Mot. for J. on the Agency R. 1 (Feb. 28, 2014), ECF No. 40 ("Def. Opp'n").  The court grants the Department's partial voluntary remand request and in addition directs Commerce to reconsider its method of accounting for SG&A expenses in the normal value calculations.

## I. BACKGROUND

The decision contested in this case concluded an antidumping duty less-than-fair-value investigation.  *See Drawn Stainless Steel Sinks From the People's Republic of China: Investigation, Final Determination*, 78 Fed. Reg. 13,019 (Int'l Trade Admin. Feb. 26, 2013) ("*Final Determination*"), *as amended*, 78 Fed. Reg. 21,592 (Int'l Trade Admin. Apr. 11, 2013). In response to a petition by Elkay, Commerce initiated the investigation, which examined imports of subject merchandise made during the period of July 1, 2011 through December 31, 2011 ("period of investigation" or "POI").  *Drawn Stainless Steel Sinks From the People's Republic of China: Initiation of Antidumping Duty Investigation*, 77 Fed. Reg. 18,207 (Int'l Trade Admin. Mar. 27, 2012).  On May 14, 2012, Commerce selected for individual investigation as "mandatory respondents" two Chinese producer/exporters—Dongyuan and a combined entity Commerce identified as consisting of Zhongshan Superte Kitchenware Co., Ltd. ("Superte") and a related invoicing company, Foshan Zhaoshun Trade Co., Ltd. ("Zhaoshun")

(collectively identified as "Superte/Zhaoshun"). *Final Determination*, 78 Fed. Reg. at 13,019 n.2.

On October 4, 2012, Commerce issued a preliminary determination ("Preliminary Determination") that imports of subject merchandise from China are being, or are likely to be, sold in the United States at less than fair value. *Drawn Stainless Steel Sinks From the People's Republic of China: Antidumping Duty Investigation*, 77 Fed. Reg. 60,673, 60,673 (Int'l Trade Admin. Oct. 4, 2012) ("*Prelim. Determination*"). Commerce calculated preliminary weighted-average dumping margins of 54.25% for Dongyuan, 63.87% for Superte/Zhaoshun, and a simple average of the two rates, 59.06%, for "separate-rate" respondents, i.e., those producer/exporters not selected for individual examination that had demonstrated independence from the government of China. *Id.* at 60,674.

Commerce published its Final Determination on February 26, 2013 and issued an accompanying Issues and Decision Memorandum ("Decision Memorandum").[3] *See Final Determination*, 78 Fed. Reg. at 13,019; *Issues & Decision Mem. for the Final Determination in the Antidumping Duty Investigation of Drawn Stainless Steel Sinks from the People's Republic of China*, A-570-983 (Feb. 19, 2013) (Admin.R.Doc. No. 417) ("*Decision Mem.*"), *available at* http://enforcement.trade.gov/frn/summary/PRC/2013-04379-1.pdf (last visited Dec. 16, 2014). In the Final Determination, Commerce determined that imports of subject merchandise from China are being, or are likely to be, sold in the United States at less than fair value. *Final*

---

[3] Commerce published an amended final determination of the less-than-fair-value investigation and the antidumping duty order, correcting an issue concerning the exporter/producer combinations of one separate-rate exporter, without making any changes to the antidumping margins. *Drawn Stainless Steel Sinks from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 78 Fed. Reg. 21,592, 21,593 (Int'l Trade Admin. Apr. 11, 2013).

*Determination*, 78 Fed. Reg. at 13,019.  Making certain changes to the analysis it used for the

Preliminary Determination, Commerce assigned weighted-average dumping margins of 27.14%

to Dongyuan, 39.87% to Superte/Zhaoshun, and a simple average of the two rates, 33.51%, to

the separate-rate respondents.  *Final Determination*, 78 Fed. Reg. at 13,020, 13,023.

Elkay initiated an action challenging the Final Determination by filing a summons on

May 6, 2013 and a complaint on June 5, 2013.  Summons, ECF No. 1; Elkay Compl. ¶ 1.

Dongyuan initiated a separate action challenging the Final Determination by filing a summons

on May 13, 2013 and a complaint on June 12, 2013.  Summons, ECF No. 1 (Ct. No. 13-00199);

Dongyuan Compl. ¶ 1.  The court consolidated these cases on August 30, 2013.[4]  Order, ECF

No. 25.

Elkay and Dongyuan filed their motions for judgment on the agency record and

accompanying briefs on October 21, 2013.  Elkays Mot.; Rule 56.2 Br. of Elkay Mfg. Co. in

Supp. of its Mot. for J. on the Agency R., ECF No. 29 ("Elkay Br."); Dongyuan Mot.; Consol.

Pl. Guangdong Dongyuan Kitchenware Mem. in Supp. of Mot. for J. on the Agency R., ECF

No. 31 ("Dongyuan Br.").  On February 28, 2014, defendant filed a consolidated response in

opposition to both motions, Def. Opp'n 1, and Dongyuan filed a response opposing

Elkay's 56.2 motion, Def.-Intervenor Guangdong Dongyuan Kitchenware Resp. Br. in Opp'n to

Pl.'s Rule 56.2 Mem., ECF No. 39 ("Dongyuan Opp'n.").  Elkay and Dongyuan each filed

replies on April 4, 2014.  Consol. Pl. Guangdong Dongyuan Kitchenware Reply Br. in Supp. of

---

[4] The court consolidated Guangdong Dongyuan Kitchenware Industrial Co., Ltd. v. United States, Ct. No. 13-00199, under Elkay Mfg. Co. v. United States, Ct. No. 13-00176. Order of Consolidation and Scheduling 3 (Aug. 30, 2013), ECF No. 25.  Although defendant requested consolidation with an additional case, Artisan Mfg. Corp. v. United States, Court No. 13-00169, the court declined to consolidate that case because of the dissimilarity between the issues raised therein and those raised in the other two cases.  *Id.* at 2-3.

Mot. for J. on the Agency R., ECF No. 44 ("Dongyuan Reply"); Reply Br. of Elkay Mfg. Co. in

Supp. of its Mot. for J. on the Agency R., ECF No. 45 ("Elkay Reply").

## II. DISCUSSION

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980,

28 U.S.C. § 1581(c), pursuant to which the court reviews actions commenced under

section 516A of the Tariff Act of 1930, as amended (the "Tariff Act"), 19 U.S.C. § 1516a,

including an action contesting a final determination that Commerce issues to conclude an

antidumping investigation.[5]  In reviewing a final determination, the court "shall hold unlawful

any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on

the record, or otherwise not in accordance with law . . . ."  19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence is evidence that "a reasonable mind might accept as adequate to support a

conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

Section 773(c)(1) of the Tariff Act, 19 U.S.C. § 1677b(c)(1), provides for the calculation

of the normal value of subject merchandise from a nonmarket economy ("NME") country "on

the basis of the value of the factors of production utilized in producing the merchandise," plus

certain additions.[6]  The statute directs that "the valuation of the factors of production shall be

based on the best available information regarding the values of such factors in a market economy

country or countries considered to be appropriate by the administering authority."  *Id.*

---

[5] Unless otherwise specified, all statutory citations herein are to the 2012 edition of the United States Code and all citations to regulations herein are to the 2013 edition of the Code of Federal Regulations.

[6] A "nonmarket economy country" ("NME") is defined in 19 U.S.C. § 1677(18)(A) as "any foreign country that the administering authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise."

A.  The Court Grants Defendant's Request for a Voluntary Remand so that Commerce May
     Reconsider the Use of Thai Import Data to Value Cold-Rolled Stainless Steel Coil

During the antidumping investigation, Commerce identified Colombia, Indonesia, Peru,

the Philippines, South Africa, Thailand, and Ukraine as countries comparable to the PRC in

terms of economic development and found that all of these countries, excluding the Philippines,

were significant producers of merchandise comparable to the merchandise under consideration.

*Decision Mem. for Prelim. Determination for the Antidumping Duty Investigation of Drawn*

*Stainless Steel Sinks from the People's Republic of China* 6 (Sept. 27, 2012) (Admin.R.Doc.

No. 337) ("*Prelim. Decision Mem.*"), *available at*

http://enforcement.trade.gov/frn/summary/PRC/2012-24549-1.pdf (last visited Dec. 16, 2014).

Noting that cold-rolled stainless steel coil is the chief raw material used to produce the subject

merchandise, Commerce chose Thailand as the primary surrogate country for the Preliminary

Determination, finding that "Thailand provides the most specific information to value each

respondent's most significant input (*i.e.*, stainless steel)." *Id.* at 7.  Comparing Thai import data

published in the Global Trade Atlas ("GTA") to available GTA import data from the Philippines

and Indonesia, which Superte/Zhaoshun proposed for use but which Commerce considered less

specific to the input to be valued, Commerce chose Thai import data. *Id.* at 7, 16-17.  Commerce

excluded from the GTA Thai import database the imports from various countries that Commerce

found to maintain broadly available subsidies. *Id.* at 17.  Commerce also excluded imports from

countries on which Thailand imposes antidumping duties. *Id.*  In the Final Determination,

Commerce continued to select Thailand as the primary surrogate country with which to value the

cold-rolled stainless steel coil inputs and continued to make the exclusions from the import

database.[7]  *See Decision Mem.* 8-10.

In contesting the Department's valuation of the stainless steel coil factor of production

("FOP"), Dongyuan seeks an order directing Commerce "to forego reliance on any Thai import

statistics for cold-rolled steel inputs consumed by Dongyuan Kitchenware."  Dongyuan Br. 35.

Raising various objections to the suitability and reliability of the Thai import data, Dongyuan

argues that Commerce should have valued the input using GTA import data for the Philippines

and for Indonesia, which both investigated respondents placed on the record.  *Id.* at 2-5, 14-34.

In response to Dongyuan's challenge, defendant requests a voluntary remand so that

Commerce may consider whether the Thai import data used in the Final Determination were

aberrational.  Def. Opp'n 7, 15-16.  To address that question, defendant would compare the Thai

GTA import data with GTA import data from other potential surrogate countries, namely

Colombia, Indonesia, Peru, South Africa, Ukraine, and the Philippines.  *Id.* at 15-16.  Defendant

explains that Commerce did not place on the record information pertaining to potential surrogate

countries other than Indonesia, the Philippines, and Thailand and that a remand would allow

Commerce to "place the missing GTA data on the record."  *Id.* at 16.  Defendant elaborates that

---

[7] For the Final Determination, Commerce continued to value the cold-rolled stainless steel coil inputs using the Thai import data but expanded the number of Harmonized Tariff Schedule ("HTS") subcategories from which to average the import statistics.  In the Preliminary Determination, Commerce valued the stainless steel inputs by averaging the Thai GTA import statistics from three HTS 11-digit subcategories.  For the Final Determination, Commerce averaged import statistics from an additional three HTS 11-digit subcategories.  *Issues & Decision Mem. for the Final Determination in the Antidumping Duty Investigation of Drawn Stainless Steel Sinks from the People's Republic of China* 8-10, A-570-983 (Feb. 19, 2013) (Admin.R.Doc. No. 417) ("*Decision Mem.*"), *available at* http://enforcement.trade.gov/frn/summary/PRC/2013-04379-1.pdf (last visited Dec. 16, 2014).

"[g]ranting a remand will enable the parties to make arguments concerning the omitted

evidence[] and will enable Commerce to address those arguments in the first instance." *Id.*

        Dongyuan opposes defendant's voluntary remand request, arguing that Commerce did

not compile the list of surrogate countries based on average unit values ("AUVs") of imports in

the surrogate countries and that there is no record basis on which to conclude that the other

potential surrogate countries have "usable data."[8]  Dongyuan's Reply 6-9.  Dongyuan submits

that the court should not permit Commerce to undergo the "burdensome and unreasonable task,"

*id.* at 9, of recreating a record of world import prices of all surrogate countries listed on the

surrogate country list or permit Commerce to "cherry-pick off-the-record data that it has

concluded would bolster its Final Determination," *id.*  According to Dongyuan, allowing

Commerce to reopen the record and examine import data from other surrogate countries would

allow Commerce to "defend petitioners' proposed high import AUVs after the close of the

factual record and after that factual record is briefed by supplementing the record

post-investigation."  *Id.* at 10.  Dongyuan requests that the court instead rule that the existing

"administrative record cannot support a finding that fairly traded Thai import statistics are

non-aberrant," *id.* at 22, and instruct Commerce "to disregard Thai import AUVs in selecting the

'best available information' for the surrogate value for Dongyuan Kitchenware's cold-rolled

steel," *id.*

        The court will grant the Department's voluntary remand request so that Commerce may

reconsider its use of the Thai import data to value the steel coil input and reopen the record to

admit additional data.  The court rejects Dongyuan's position that the court, instead of granting

---

        [8] Although Elkay is a defendant-intervenor in Dongyuan's challenge, Elkay did not file
an opposition to Dongyuan's Rule 56.2 Motion and did not take a position in its briefings to the
court on defendant's request for a voluntary remand.

the voluntary remand request, should issue a remand order that prohibits Commerce from using

the Thai data to value the steel coil input.[9]

Granting defendant's request for a voluntary remand is appropriate because the

Department's concerns regarding the previous decision to use the Thai import data are

substantial and legitimate.  *See SKF USA Inc. v. United States*, 254 F.3d 1022, 1028-29 (Fed.

Cir. 2001).  Because the decision to reopen the record in a remand proceeding ordinarily is a

matter for an agency to decide, and because Commerce has advanced a legitimate reason to

reopen the record in this case, the court rejects Dongyuan's argument that the court should not

permit Commerce to admit additional import data to the record.  The voluntary remand that

defendant requests will permit Commerce to reconsider its previous valuation of the steel coil

FOP on the basis of more complete information.  In their comments on the remand

redetermination, the parties to this litigation will have the opportunity to comment on any new

evidence submitted to the record and on the decision Commerce reaches upon reconsideration.

---

[9] Dongyuan also argues that the use of Thai surrogate data is inconsistent with the
Department's policies and practices concerning the threshold at which a nonmarket economy
respondent's market economy purchases of a particular factor of production may be considered
representative of that factor.  Consol. Pl. Guangdong Dongyuan Kitchenware Mem. in Supp. of
Mot. for J. on the Agency R. 31-34 (Oct. 21, 2013), ECF No. 31 ("Dongyuan Br.").  Defendant
argues that the court should reject Donguyan's argument concerning market economy purchases
on the ground that "Dongyuan relies on a regulation that was not in effect during the relevant
timeframe and, to the extent that Dongyuan's challenge is based upon the prior policy that was
then in effect, Dongyuan failed to exhaust its administrative remedies."  Def.'s Resp. to Pl.'s
Rule 56.2 Mot. for J. on the Agency R. 7 (Feb. 28, 2014), ECF No. 40 ("Def. Opp'n").  Because
the court is granting a voluntary remand, the decision to which Dongyuan directs the market
economy purchase argument—that is the Department's decision to use Thai surrogate data—will
be reconsidered on remand.  Therefore, the court finds it unnecessary to consider at this time
Dongyuan's market economy purchase argument and defendant's corresponding responses.

B.  The Court Orders a Remand on the Department's Treatment of SG&A Labor Expenses

Section 773(c)(1) of the Tariff Act, 19 U.S.C. § 1677b(c)(1), provides generally that the

normal value of subject merchandise produced in a non-market economy country shall be

determined "on the basis of the value of the factors of production utilized in producing the

merchandise and to which shall be *added* an *amount* for *general expenses* and profit plus the cost

of containers, coverings, and *other expenses*." *Id.* (emphasis added).  The statute further

provides that "the factors of production utilized in producing merchandise include, but are not

limited to . . . *hours of labor required . . . .*" *Id.* § 1677b(c)(3)(A) (emphasis added).  In this way,

the statute provides for the separate valuation of the hours of labor required in producing the

subject merchandise and of additional expenses (i.e., "general" and "other" expenses) in the

NME normal value calculation.  In identifying the "hours of labor required" as a factor of

production, the statute does not distinguish between labor expended to produce subject

merchandise (i.e., "production" labor) and labor expended in performing non-production

activities (i.e., "non-production" labor), such as labor associated with the performance of selling,

general, and administrative ("SG&A") functions.

Although Commerce has discretion in determining the best method for constructing

normal value (whether or not in the non-market economy context), it must exercise its discretion

consistently with the purpose of the antidumping statute, that is, to "determine margins 'as

accurately as possible.'" *Lasko Metal Products, Inc. v. United States*, 43 F.3d 1442, 1446

(Fed. Cir. 1994) (citing *Rhone Poulenc, Inc. v. United States,* 899 F.2d 1185, 1191 (Fed.

Cir. 1990)); *Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States*,

268 F.3d 1376, 1382 (Fed. Cir. 2001) ("*Shakeproof*") ( "In determining the valuation of the

factors of production, the critical question is whether the methodology used by Commerce is

based on the best available information and establishes antidumping margins as accurately as

possible."). This principle applies even though the process of constructing normal value "is

difficult and necessarily imprecise." *Shakeproof*, 268 F.3d at 1381 (citing *Nation Ford Chem.*

*Co. v. United States,* 166 F.3d 1373, 1377 (Fed. Cir. 1999)).

Elkay's challenge concerns the method Commerce used to account for certain

non-production labor—specifically, the labor that the two investigated respondents expended in

performing SG&A functions—in calculating the normal value of the subject merchandise of

those respondents. Elkay claims that Commerce failed to include in the normal value calculation

the total cost of the "hours of labor required," as required by 19 U.S.C. § 1677b(c)(3)(A), or to

capture satisfactorily "general expenses," as required by 19 U.S.C. § 1677b(c)(1). Elkay Br. 10.

Stated simply, Elkay's claim is that Commerce impermissibly understated normal value for the

two investigated respondents by failing to capture adequately the labor component of the SG&A

expenses of those respondents. *Id.* at 12. Elkay alleges, specifically, that the hours of labor

reported by the two investigated respondents, a factor of production to which Commerce applied

a surrogate value based on data pertaining to Thailand, included only hours of production labor

and, therefore, did not include any hours of labor expended in performing SG&A functions. *Id.*

at 8-9. According to Elkay's argument, Commerce failed to capture the SG&A labor costs when

valuing the hours of labor reported by the investigated respondents as a factor of production and

also excluded the SG&A labor costs when it performed its SG&A expense calculation. *Id.* at 9.

The Department's regulations provide that "[f]or manufacturing overhead, general

expenses, and profit, the Secretary normally will use non-proprietary information gathered from

producers of identical or comparable merchandise in the surrogate country." 19 C.F.R.

§ 351.408(c)(4). Commerce usually calculates separate values for factory overhead, SG&A

expenses, and profit by calculating and applying financial ratios derived from financial

statements of one or more producers of comparable merchandise in the primary surrogate

country.  *See Dorbest Ltd. v. United States*, 604 F.3d 1363, 1368 (Fed. Cir. 2010) ("In addition to

these methods of valuing the direct inputs to production, Commerce also values selling, general,

and administrative expenses ("SG & A"), factory overhead, and profit . . . using financial ratios

derived from publicly-available financial statements of producers of comparable merchandise in

the surrogate country.") (citing 19 C.F.R. § 351.408(c)(4)).  According to the Department's

Antidumping Manual, the Department's practice is to calculate a ratio for "general expenses"

and to apply this ratio to the sum of the amount calculated for a respondent's "total of materials,

labor, energy, and factory overhead."[10]  *Import Admin. Antidumping Manual, Chapter 10:*

*Non-Market Economies* 18 (2009 ed.), *available at*

http://enforcement.trade.gov/admanual/2009/Chapter%2010%20NME.pdf (last visited

Dec. 16, 2014).

　　　In the Preliminary Determination of this investigation, Commerce determined surrogate

ratios for SG&A expenses, combined with interest expenses, for each of three companies in the

chosen surrogate country, Thailand, using data on those expenses reported in the financial

---

[10] "Factory overhead" is described in the Department's Antidumping Manual as follows:

The most important component of factory overhead is depreciation.  It can also
include supervisory and indirect labor, maintenance, and energy that is not
significant enough to be valued separately.  Normally, factory overhead is
expressed as a percentage of materials, labor, and energy of the surrogate
producer, and is applied to the materials, labor, and energy costs of the exporter.

*Import Admin. Antidumping Manual, Chapter 10: Non-Market Economies* 18 (2009 ed.)
(footnote omitted), *available at*
http://enforcement.trade.gov/admanual/2009/Chapter%2010%20NME.pdf (last visited
Dec. 16, 2014).

statements of the three companies. *Factor Valuation Mem. for Prelim. Determination* 7-8,

Attach. 5 (Sept. 27, 2012) (Admin.R.Doc. No. 342-343) ("*Prelim. Factor Valuation Mem.*").

The numerators of these SG&A/interest expense ratios calculated for the Preliminary

Determination contained the SG&A and interest expenses listed in the surrogate financial

statements. *Id.* The denominators of these ratios contained expenses listed in the surrogate

financial statements for raw material, labor, energy, manufacturing overhead, and the cost of

purchased goods and inventory. *Id.* From the three separate ratios, Commerce calculated an

average ratio for use in determining surrogate SG&A/interest expenses for the two investigated

respondents, Superte/Zhaoshun and Dongyuan. *Id.*

In the Final Determination, Commerce used the same three financial statements to

calculate the three SG&A/interest expense ratios but applied a different method. This method

resulted in an average SG&A/interest ratio that was substantially lower than the average ratio

calculated in the Preliminary Determination. *Decision Mem.* 15. The financial statements of all

three Thai companies reported production labor costs separately from certain other labor costs,

which were itemized and categorized among the sales or administrative expenses in the surrogate

financial statements. *See Pet'r's Submission of Surrogate Values* Ex. 10 (Aug. 13, 2012)

(Admin.R.Doc. No. 262) ("*Elkay's Surrogate Values Submission*") (including financial

statements from Stainless Steel Home Equipment Manufacturing Co., Ltd. and Diamond Brand

Co., Ltd.); *Dongyuan's Rebuttal Surrogate Values for the Prelim. Results* Exs. 4-6

(Aug. 20, 2012) (Admin.R.Doc. No. 296) (including financial statements from Advance

Stainless Steel Co., Ltd.). The record indicates that Commerce excluded a number of the labor

costs identified in the financial statements as sales or administrative expenses (and described by

Commerce as "SG&A labor costs") from the numerators of the three SG&A/interest expense

ratios and included these costs in the denominators of those ratios.[11]  *See Factor Valuations for the Final Determination*, Attach. 1 (final surrogate value worksheets) (Feb. 19, 2013) (Admin.R.Doc. No. 422) ("*Final Factor Valuations Mem.*").  As defendant explains in its brief, reclassifying the line items in the surrogate financial statements that Commerce determined to correspond to SG&A labor "reduces the surrogate SG&A ratio by decreasing the total SG&A expenses in the numerator and increasing the labor expense in the denominator."[12]  Def. Opp'n 9.  Reclassifying these SG&A labor costs reduced the 12.82% average SG&A/interest expense ratio of the Preliminary Determination to a 6.36% average ratio in the Final Determination, a reduction of more than half.  *Compare Prelim. Factor Valuation Mem.* 8 *with Final Factor Valuations Mem.* 2.

　　　　The rationale Commerce provided in the Decision Memorandum for the decision to change the SG&A/interest expense ratio calculation relied in part on the surrogate labor rate with which Commerce valued the labor hours reported by the two investigated respondents.  *Decision Mem.* 15.  For the Preliminary Determination, Commerce valued the two respondents' reported

---

[11] The adjustment at issue in this action also reduced the manufacturing overhead ratios by increasing labor expense in the denominators.  *Factor Valuations for the Final Determination*, Attach. 1 (Feb. 19, 2013) (Admin.R.Doc. No. 422) ("*Final Factor Valuations Mem.*") (showing method used for determining overhead ratio).  The average factory overhead and profit ratios Commerce calculated from the financial statements of the Thai companies are not challenged in this case.  Commerce calculated the factory overhead ratios by dividing manufacturing overhead expenses, including, *inter alia*, supplies, repairs/maintenance, and depreciation, by a sum of materials, labor, and energy.  *Id.*  Commerce calculated the profit ratios by dividing the before tax profit by a total of materials, labor, energy, SG&A expense, overhead, and the cost of purchased goods and inventory.  *Id.*

[12] As defendant also explains in its brief, "Commerce calculates the SG&A ratio by dividing total SG&A expenses (designated as 'SGA') by the total cost of material, labor, energy, manufacturing overhead, and finished or traded goods."  Def. Opp'n 9 n.7 (citation omitted).  Continuing its discussion of the calculation of normal value for a NME respondent, defendant explains that "the surrogate SG&A ratio is multiplied by the respondent's total cost of manufacturing, overhead, and finished and traded goods . . . ."  *Id.* at 9.

labor hours using a surrogate labor rate derived from 2005 data from Chapter 6A of the

International Labor Organization ("ILO") Yearbook of Labor Statistics.  *Prelim. Factor*

*Valuation Mem.* 5-6.  The record indicates that the ILO labor rate Commerce applied in the

Preliminary Determination was 141.2162 Thai Bhat ("THB") per hour.  *Id.* at Attach. 4.

 Following the Preliminary Determination, Dongyuan submitted for admission to the

record certain data on the labor cost of "[m]anufacture of other fabricated metal products not

enumerated elsewhere" contained in the "Industrial Census 2007" published by Thailand's

National Statistics Office ("NSO").  *Dongyuan's Final Surrogate Value Submission—Part I*,

Ex. SV-1 (Nov. 26, 2012) (Admin.R.Doc. No. 373) ("*Dongyuan's Final Surrogate Value*

*Submission*").  For the Final Determination, Commerce applied the NSO labor rate as a surrogate

labor rate to value the examined respondents' reported labor hours.  *Decision Mem.* 11.

Commerce concluded that the NSO data were superior to the ILO data, finding "that the 2007

NSO data for labor cost of 'manufacturing of other fabricated metal products' (ISIC Rev.3

Code: 2899) is the best information available on the record to calculate the labor cost of the two

respondents in the final determination."  *Id.* (citation omitted in original).  Commerce explained

that "[t]his is because the 2007 NSO data are the most product-specific and contemporaneous[]

and provide a broader market average among all the data parties placed on the record."  *Id.*

According to the Decision Memorandum, the hourly rate obtained from the NSO data was

54.61 THB per hour.  *Id.* at 12.  It appears from the record that the rate as adjusted for inflation

and applied was 63.1158 THB per hour.  *See Final Factor Valuations Mem.* 3 ("The SV

[surrogate value] for labor is 63.12 THB/hr.") & Attach. 1 (showing an applied rate of 63.1158;

*see also Dongyuan's Final Surrogate Value Submission*, Ex. SV-1.  The surrogate labor rate

applied in the Final Determination, therefore, was less than half of the 141.2162 THB/hour rate applied in the Preliminary Determination.[13]

According to the Decision Memorandum, Dongyuan argued during the investigation that "[t]he Department should treat selling, general and administrative ('SG&A') labor line items (sales, administrative and managerial staff and directors' salaries) in the surrogate financial statements as manufacturing labor, not SG&A labor, in its financial ratio calculations because the underlying ILO Chapter 6A data and the NSO Industrial Census data include these expenses." *Decision Mem.* 14.  In the Final Determination, Commerce agreed with Dongyuan's proposed change, stating that "[a]fter examining the record, we agree with Dongyuan that the NSO data include total labor costs (*i.e.*, manufacturing and SG&A) . . . ." *Id.* at 15.

Commerce explained that it intended to account for SG&A labor by applying to the hours of labor reported by each examined respondent a surrogate labor rate that included both manufacturing and SG&A labor costs. *Id.*  Commerce also stated that "[u]sing a surrogate financial ratio that includes SG&A labor costs in addition to the NSO-based surrogate labor rate would double-count those costs in normal value because both include an amount for SG&A labor." *Id.*  Commerce concluded its discussion by stating that "to avoid double-counting SG&A labor, we have determined to exclude labor costs from the SG&A surrogate financial ratios for the final determination." *Id.*

---

[13] During the administrative proceeding, Dongyuan alleged that Commerce had erred in converting the monthly Thai labor rate in the ILO Chapter 6A data into an hourly rate by incorrectly presuming a lower number of hours worked during the month. *Decision Mem.* 10-11. In the Decision Memorandum, Commerce did not address this issue because it had selected the NSO data rather than the ILO Chapter 6A data. *Id.* at 14.  Although any recalculation of the hourly rate from the monthly rate might lower the ILO Chapter 6A rate, the resulting rate still would likely be substantially higher than the NSO rate.

Elkay argues that Commerce should be required to calculate the SG&A/interest expense

ratios as Commerce did in the Preliminary Determination—by placing in the numerator of the

SG&A/interest expense ratios all SG&A expenses reported in the surrogate companies' financial

statements, including SG&A labor costs.  Elkay Br. 12.  Elkay submits that although "the NSO

labor rate was an average based on compensation for all types of labor, including both

production and non-production labor," *id.* at 8-9, the "labor rate was only applied to production

labor hours," *id.* at 9, and not to the non-production labor expended in performing SG&A

functions.  Elkay asserts that because Commerce "applied the revised surrogate labor rate to a

labor FOP that includes only production hours, Commerce failed to capture any SG&A labor

costs in the calculation of normal value."  *Id.* at 6.

There can be no dispute that Commerce intentionally used an average ratio for SG&A

and interest expenses that captured less than the full amount of the SG&A expenses as reported

in the surrogate financial statements.  It also appears from the record that the labor hours

reported as a factor of production by both investigated respondents included only hours of

production labor. [14]  But it does not necessarily follow, as Elkay argues, that "Commerce failed

---

[14] According to defendant, neither Dongyuan's nor Superte/Zhaoshun's reported labor hours included labor for SG&A functions because both parties reported labor that was "directly related to the production of subject merchandise."  Def. Opp'n 3.  The Decision Memorandum, however, does not mention that Superte/Zhaoshun reported only production labor hours.  In the Decision Memorandum, Commerce acknowledged only as to Dongyuan that it applied the NSO labor rate to a quantity of labor hours that did not include SG&A labor.  *Decision Mem.* 15 ("Dongyuan's labor FOPs do not include SG&A labor hours . . . .").  The Department's questionnaire asked respondents to "[r]eport the indirect labor hours required to produce a unit of the merchandise under consideration," adding that "[i]ndirect labor includes all workers not previously reported who are indirectly involved in the production of the merchandise under consideration."  *Dongyuan's Section D Questionnaire Resp.* D-10 to D-11 (July 3, 2012) (Admin.R.Doc. No. 215); *Superte/Zhaoshun's Sections C & D Questionnaires Resp.* D-12 (July 30, 2012) (Admin.R.Doc. Nos. 244-45).  The questionnaire did not specifically request that respondents report non-production labor, including labor associated with SG&A functions.

to capture any SG&A labor costs in the calculation of normal value." Elkay Br. 6. Elkay's

characterization assumes that Commerce omitted SG&A labor costs entirely from the normal

value determination considered as a whole. Because the surrogate labor rate Commerce applied

to the quantities of labor hours reported by the two investigated respondents bears some

relationship to non-production labor costs, Elkay has not demonstrated that the calculation

Commerce used to value the examined respondent's labor hours failed to capture any SG&A

labor costs. Nevertheless, as discussed below, the court cannot sustain the principal conclusion

underlying the Department's decision.

<u>1.  The Principal Conclusion Underlying the Department's Decision to Adjust the SG&A/Interest
Expense Ratios is Not Supported by Substantial Record Evidence</u>

In recounting the Department's reasons for making the adjustments, the Decision

Memorandum states a finding that the NSO data include "total labor costs (*i.e.*, manufacturing

and SG&A) . . . ."[15] *Decision Mem.* 15. From this finding, Commerce reached the conclusion

that "[u]sing a surrogate financial ratio that includes SG&A labor costs in addition to the

NSO-based surrogate labor rate would double-count those costs in normal value because both

include an amount for SG&A labor." *Id.* Referring implicitly to the specific adjustment that it

made to the surrogate financial ratios, Commerce further concluded that this adjustment was

necessary in order "to avoid double-counting SG&A labor." *Id.* As the court discusses below,

the record lacks substantial evidence to support the Department's conclusion that

"double-counting" of SG&A labor expenses required the specific downward adjustments to the

---

[15] The full statement of this finding in the Decision Memorandum is: "After examining
the record, we agree with Dongyuan that the NSO data include total labor costs (*i.e.*,
manufacturing and SG&A), including wages, earnings, overtime, bonuses, special payments,
cost of living allowances and commissions, as well as, fringe benefits such as, beverages,
lodgings, rent, medical care, transportation, recreational and entertainment services, *etc.*"
*Decision Mem.* 15.

SG&A/interest expense ratios that Commerce found necessary when calculating the normal

value for the merchandise of Dongyuan and Superte/Zhaoshun.[16]  The court, therefore, must hold

invalid the principal conclusion underlying the decision to make the adjustments to the

SG&A/interest expense ratios.

Record evidence indicates that the NSO labor rate is derived from data on

"remuneration" paid to "[p]ersons engaged" in the "manufacture of other fabricated metal

---

[16] The basis for the substantial reduction in the ratios (which was by more than half, as explained above) is apparent from an examination of the categories of SG&A costs that Commerce regarded as labor costs and excluded from the numerators, and included in the denominators, of the three SG&A/interest expense ratios.  *See Final Factor Valuations Mem.* Attach. 1.

The financial statement of Stainless Steel Home Equipment Manufacturing Co., Ltd. ("Stainless Steel"), one of the three surrogate companies, lists "Salaries and bonuses" under the category of "Cost of Administration" and "Wages of producing" under the category of "cost of production."  *See Pet'r's Submission of Surrogate Values* Ex. 10 (Aug. 13, 2012) (Admin.R.Doc. No. 262) ("*Elkay's Surrogate Values Submission*").  In the Final Determination, Commerce regarded both of these cost line items as labor costs, not SG&A expenses, for the purpose of calculating the SG&A/interest expense ratio.  *Final Factor Valuations Mem.*, Attach. 1.  In addition to "Salaries and bonuses," the "Cost of Administration" category reported line items for "Welfare," "Social Security," and "Compensation Fund."  *Elkay's Surrogate Values Submission* Ex. 10.  In the Final Determination, Commerce also regarded these three cost line items as labor costs.  *Final Factor Valuations Mem.*, Attach. 1.

The financial statement of Diamond Brand Co., Ltd., another one of the three surrogate companies, includes line items for salary both under a category labeled "Selling and administrative expenses" and under a category of "Administrative Expenses" as well as a line item for "Labor cost" under the "Cost of production" category.  *Elkay's Surrogate Values Submission* Ex. 10.  Commerce treated all of these costs as labor costs for the purpose of calculating the SG&A/interest expense ratio.  *Final Factor Valuations Mem.*, Attach. 1.

The financial statement of Advance Stainless Steel Co., Ltd., the third of the three surrogate companies, lists expenses for "Labor cost, Overtime, and Welfare" under the category of "Production Expenses" but also lists "Salary, Bonus, and Overtime" and "Social security and providend fund" under the category of "Selling and Administrative Expenses."  *Dongyuan's Rebuttal Surrogate Values for the Prelim. Results* Exs. 4-6 (Aug. 20, 2012) (Admin.R.Doc. No. 296).  Here also, Commerce treated all of these line items costs as labor cost rather than SG&A expense.  *Final Factor Valuations Mem.*, Attach. 1.

products." *Dongyuan's Final Surrogate Value Submission*, Ex. SV-2 (containing the NSO's

description of its methodology and definitions).  The NSO defined "[p]ersons engaged" to

include: (1) "[u]npaid workers" who are "owners or business partners who managed or

participated in the management of the establishment;" (2) "[o]peratives" that "were directly

engaged in the production or other related activities of the establishment and received pay;" and

(3) "other employees" referring to "all employees other than operatives," including

"administrative, technical and clerical personnel such as salaried managers and directors,

laboratory and research workers, clerks, typists, book-keepers, administrative supervisors,

salesman and the like." *Id.*  The NSO's definitions specify that excluded from the "persons

engaged" are: (1) "managers or directors paid solely for their attendance at meeting[s] of the

board of director[s];" (2) [p]ersons from other establishment[s] working at this establishment;

(3) "[h]ome workers;" (4) "[p]ersons who were on leave for military services or one who had

obtained long leave or were on strike"; and (5) "[p]ersons who were employed to work

occasionally such as laborer[s] and sale agents who do not receive regular pay." *Id.*

     The NSO information supports a finding that the NSO rate was derived from an average

remuneration paid for "persons engaged" in various production-related and non-production-

related activities.  It also supports a finding that the NSO rate is a much broader average than one

representing only wages and salaries.  The NSO definition of "[r]emuneration" includes:

(1) "[w]ages/salaries;" (2) "[o]vertime, bonus, special payment, cost of living allowance and

commission;" (3) "fringe benefits;" and (4) "[e]mployer's contribution to social security"

(including as examples, payments to a "social security fund, workmen's compensation fund[,]

and health insurance, etc."). *Id.*  Based on the record evidence, Commerce could conclude that

the NSO labor rate is higher than it would have been had it been derived solely from data on wages and salaries.

Less clear is that the NSO labor rate is higher than it would have been had it been derived solely from data on production workers.  It may be reasonable to infer that *some* non-production employees, e.g., high-level salaried managerial employees, receive higher remuneration than persons engaged in production.  The record data, however, do not support an actual finding that the NSO labor rate was higher—or by what percentage it was higher—than it would have been had it been derived solely from Thai data on production labor rather than from a combination of Thai data on production labor and various types of non-production labor.  Apparently, missing from the record are the raw data from which the NSO rate was derived, which possibly could support such conclusions.

The court has considered the record evidence, summarized above, on the derivation of the NSO labor rate and on the derivation, and the magnitude, of the downward adjustments Commerce made to the three SG&A/interest expense ratios (and, accordingly, to the average SG&A/interest expense ratio applied in determining the normal value of the two investigated respondents).  On this administrative record, the Department's reliance on the extent of any "double-counting," *Decision Mem.* 15, was too much a matter of speculation.  The record lacks substantial evidence to support the Department's conclusion that the rate Commerce applied to the hours of production labor reported by the investigated respondents overstated the value of those labor hours to such an extent as to justify the specific, compensatory adjustments that Commerce made to the SG&A/interest expense ratios.

    2.  The Department's Reliance on the *Labor Methodologies* Notice Does Not Justify the Downward Adjustments to the SG&A/Interest Expense Ratios

In both the Preliminary Determination and in the Decision Memorandum, Commerce based its treatment of SG&A labor expenses in part on a notice ("*Labor Methodologies*") Commerce published in 2011 announcing a new methodology for valuing labor in non-market economy (NME) proceedings.[17]  *See Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production*: *Labor*, 76 Fed. Reg. 36,092 (Int'l Trade Admin. June 21, 2011) ("*Labor Methodologies*").  The Department's reasoning, and its conclusion, changed considerably from the Preliminary to the Final Determination.[18]

_____

[17] Commerce issued the *Labor Methodologies* notice to replace an interim methodology it had adopted following the decision of the U.S. Court of Appeals for the Federal Circuit in *Dorbest Ltd. v. United States*, 604 F.3d 1363 (Fed. Cir. 2010), which had invalidated the portion of the Department's regulation in 19 C.F.R. § 351.408(c)(3) according to which Commerce determined a labor rate using regression-based wages derived from a number of countries. *Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production*: *Labor*, 76 Fed. Reg. 36,092, 36,092 (Int'l Trade Admin. June 21, 2011) ("*Labor Methodologies*").  In the *Labor Methodologies* notice, Commerce states that the method announced therein would apply to nonmarket economy antidumping proceedings initiated after the June 21, 2011 publication of the notice.  *Id.* at 36,093.  Commerce initiated the investigation at issue in this action on March 27, 2012.  *Drawn Stainless Steel Sinks From the People's Republic of China: Initiation of Antidumping Duty Investigation*, 77 Fed. Reg. 18,207, 18,207 (Int'l Trade Admin. Mar. 27, 2012).

[18] In relying on the *Labor Methodologies* notice in the Preliminary Determination, Commerce explained that it had excluded from the calculation of surrogate financial ratios those "items incorporated in the labor wage rate data in Chapter 6A of the ILO data" including "bonuses and other forms of compensation included in the ILO's calculation of wages . . . ." *Decision Mem. for Prelim. Determination for the Antidumping Duty Investigation of Drawn Stainless Steel Sinks from the People's Republic of China* 18 (Sept. 27, 2012) (Admin.R.Doc. No. 337) ("*Prelim. Decision Mem.*"), *available at* http://enforcement.trade.gov/frn/summary/PRC/2012-24549-1.pdf (last visited Dec. 16, 2014). The record evidence, however, does not indicate that Commerce made adjustments to the preliminary SG&A/interest expense ratios to treat the labor-related SG&A expenses listed in the surrogate financial statements as labor expenses, as Commerce did in the Final Determination. *Compare Factor Valuation Mem. for Prelim. Determination*, Attach. 5 (Sept. 27, 2012) (Admin.R.Doc. No. 342-343) (providing the preliminary surrogate financial ratios calculation (continued . . .)

The *Labor Methodologies* notice announces that "the Department will value the NME

respondent's labor input using industry-specific labor costs prevailing in the primary surrogate

country, as reported in Chapter 6A of the ILO Yearbook of Labor Statistics."[19]  *Id.* at 36,094.

The notice creates "the rebuttable presumption that Chapter 6A data better accounts for all direct

and indirect labor costs."  *Id.* at 36,093.  The notice further explains that Commerce would

discontinue its current use of the data in ILO Chapter 5B: "Unlike Chapter 6A data that reflects

all costs related to labor including wages, benefits, housing, training, *etc.*, Chapter 5B data

reflects only direct compensation and bonuses."  *Id.*

The Decision Memorandum cited the *Labor Methodologies* notice in support of the

position that "[i]n deriving surrogate financial ratios, 'it is the Department's longstanding

practice to avoid double-counting costs *where the requisite data are available to do so.*'"

*Decision Mem.* 15 (citation omitted) (emphasis added to original in quoted source).  Commerce

noted that "in *Labor Methodologies*, we said that 'the Department will adjust the surrogate

financial ratios when the available record information—in the form of itemized indirect labor

---

(continued . . .)
worksheets for the three surrogate companies), *with Final Factor Valuations Mem.*, Attach. 1
(providing the final surrogate financial ratios calculation worksheets for the three surrogate
companies).

[19] Some language in the notice indicates that Commerce intended to use the ILO
Chapter 6A data except in transitional cases; other language suggests that the Department did not
intend to limit itself to the ILO Chapter 6A data.  *Compare Labor Methodologies*, 76 Fed. Reg.
at 36,092 (referring to these data as the "primary" source in the summary of the Announcement),
*with id.* at 36,093 ("the Department *will* base labor cost on ILO Chapter 6A data applicable to the
primary surrogate country.") (emphasis added).

costs—demonstrates that labor costs are overstated.'"[20] *Id.* (citing *Labor Methodologies*, 76 Fed. Reg. at 36,093-94).

For two reasons, the *Labor Methodologies* notice is not an adequate justification for the decision challenged in this case. First, Commerce departed from the methodology announced in the notice by rejecting the ILO Chapter 6A data in the Final Determination in favor of the NSO data, *Decision Mem.* 13-14, resulting in a rate that was lower by more than half than one derived from ILO Chapter 6A.[21] *Compare Prelim. Factor Valuation Mem.*, Attach. 4 (applying a surrogate rate of 141.2162 THB/hr), *with Final Factor Valuations Mem.* 3 (applying a surrogate rate of 63.12 THB/hr). Second, the *Labor Methodologies* notice explains that "[i]f there is evidence submitted on the record by interested parties demonstrating that the NME respondent's cost of labor is overstated, the Department will make the appropriate adjustments to the surrogate

---

[20] The *Labor Methodologies* notice contains the following language:

> [T]he Department will determine whether the facts and information available on the record warrant and permit an adjustment to the surrogate financial statements on a case-by-case basis. If there is evidence submitted on the record by interested parties demonstrating that the NME respondent's cost of labor is overstated, the Department will make the appropriate adjustments to the surrogate financial statements subject to the available information on the record. Specifically, when the surrogate financial statements include disaggregated overhead and selling, general and administrative expense items that are already included in the ILO's definition of Chapter 6A data, the Department will remove these identifiable costs items.

*Labor Methodologies*, 76 Fed. Reg. at 36,094.

[21] The ILO Chapter 6A rate of 141.2162 Thai Bhat (THB) per hour corresponds to the total manufacturing sector for 2005, inflated to the period of investigation, and not the more specific category of labor to which the NSO data used in the Final Determination corresponds. *Decision Mem.* 11-12. Information on the record, however, indicates that the NSO data corresponding to the total manufacturing sector for 2006, inflated to the POI, was 56.60 THB per hour, demonstrating an even more drastic contrast when comparing the two rates for the broader manufacturing sector. *Dongyuan's Final Surrogate Value Submission*, Ex. SV-10 (Nov. 26, 2012) (Admin.R.Doc. No. 375-77).

financial statements subject to the available information on the record." *Labor Methodologies*, 76 Fed. Reg. at 36,094.  As the court discussed previously, the record in this case does not contain substantial evidence to support the Department's conclusion that when calculating the SG&A/interest expense ratios Commerce made appropriate adjustments to the surrogate financial statements to compensate for an overstated labor cost.

   3.  The Court Rejects Defendant's and Dongyuan's Arguments in Support of the Department's Decision on SG&A Labor Expenses

        Before the court, defendant and Dongyuan make several arguments in favor of the Department's decision to adjust the SG&A/interest expense ratios.  The court rejects these arguments for the reasons discussed below.

        Defendant states that "[u]nfortunately, the respondents did not report SG&A labor hours" and that "[b]ased on the limitations of the data on the record, Commerce was faced with two imperfect methodologies for calculating labor."  Def. Opp'n 6.  Defendant argues that "[i]n such circumstances, Commerce has broad discretion to choose between the competing methodologies," *id.* at 7, and that the court must defer to the Department's reasonable choice for labor and SG&A expense calculations, so long as that choice is accompanied by a reasoned explanation, *id.* at 15.  *See also* Dongyuan Opp'n 9 ("Even if there is another way to capture this cost, the Court must uphold this methodology if the Court finds it to be reasonable . . . .").  Regarding the choice Commerce made, defendant explains that "[a]lthough double counting was not a certainty under the record in this case, Commerce's actions recognized the possibility of double-counting,"  Def. Opp'n 14, and that "[a]s a result, Commerce reasonably excluded 'labor costs from the SG&A surrogate financial ratios for the final determination,'" *id.* (quoting *Decision Mem.* 15).

Defendant's argument is unconvincing because it is based on a mischaracterization of the

principal conclusion as stated in the Decision Memorandum: Commerce concluded that

double-counting *would* occur absent the adjustments it made to the ratios, and this was the basis

upon which Commerce determined that those adjustments were appropriate to avoid the

double-counting it found to exist.  *See Decision Mem.* 15 ("Using a surrogate financial ratio that

includes SG&A labor costs in addition to the NSO-based surrogate labor rate *would*

double-count those costs in normal value because both include an amount for SG&A labor."

(emphasis added)).  And even were the Department's decision presumed to rest upon a "reasoned

explanation," Def. Opp'n 15, that explanation cannot overcome the Department's basing its

decision on a conclusion that, for the reasons discussed, is not supported by substantial record

evidence.

Further to its argument that Commerce made a reasonable choice given two imperfect

alternatives, defendant argues that "Elkay has not established that its preferred methodology—

retaining the SG&A labor costs in the SG&A financial ratio calculation . . . while using NSO

data that indisputably includes SG&A labor—would have provided a more accurate surrogate

value for labor."  Def. Opp'n 14 (citation omitted).  Defendant argues further that Elkay "wholly

ignores the facial risk of double-counting that would be created by its proposed approach."  *Id.*

Defendant's argument fails because the court must evaluate the Department's decision

according to the applicable standard of review and cannot sustained a decision not grounded in

substantial record evidence.  The argument is also misguided in positing that Commerce had

only the two choices defendant describes.  Commerce had other choices, including choices that

did not involve use of the NSO data or choices not involving the particular adjustments it made

to the SG&A/interest expense ratios.

In support of the Final Determination, Dongyuan argues that the Department's methodology captured SG&A labor expenses because the NSO rate "applied to the production labor is artificially higher than the labor rate would be because it includes more labor expenses than production labor would normally cover." Dongyuan Opp'n 8-9. As the court discussed previously, the record shows that the NSO rate was derived from an average remuneration paid for "persons engaged" in various production-related and non-production-related activities and that it is a broader representation of labor cost than one limited to wages and salaries. But even if the NSO rate were presumed to be higher than it would be if it had not included non-production labor (a presumption for which the record lacks substantial evidence), the record would not support the Department's conclusion that the adjustments the Department made to the SG&A/interest expense ratios were appropriate adjustments for the double-counting of SG&A labor that the Department found would occur absent those adjustments.

### 4. On Remand, Commerce Must Reconsider its Decision to Adjust the SG&A/Interest Expense Ratios

On remand, Commerce must reconsider its decision to adjust the SG&A/interest expense ratios and the particular way in which it accomplished those adjustments. Additionally, because Commerce grounded its decision in part on its choice of a surrogate labor cost, it may consider on remand alternative data sources with which to value the labor hours reported by the two investigated respondents.

### III. Conclusion and Order

For the reasons discussed in the foregoing, the court remands the final determination ("Final Determination") of the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") in *Drawn Stainless Steel Sinks From the People's Republic of China: Investigation, Final Determination*, 78 Fed. Reg. 13,019 (Int'l

Trade Admin. Feb. 26, 2013) ("*Final Determination*"), *as amended*, 78 Fed. Reg. 21,592 (Int'l

Trade Admin. Apr. 11, 2013).  Therefore, upon consideration of all papers and proceedings in

this case, and upon due deliberation, it is hereby

     **ORDERED** that the Final Determination be, and hereby is, set aside as unlawful and remanded for reconsideration and redetermination in accordance with this Opinion and Order; it is further

     **ORDERED** that Commerce shall issue, within ninety (90) days of the date of this Opinion and Order, a new determination upon remand ("Remand Redetermination") that conforms to this Opinion and Order and reconsiders the use of surrogate information from Thailand to value cold-rolled stainless steel coil when determining the normal value of Dongyuan's subject merchandise; it is further

     **ORDERED** that if Commerce places additional surrogate value data on the record on remand, Commerce must provide parties to this litigation the opportunity to submit comments concerning those data and the Department's decision addressing the valuation of cold-rolled stainless steel coil; it is further

     **ORDERED** that in the Remand Redetermination, Commerce shall reconsider its method of accounting for selling, general, and administrative ("SG&A") labor costs in its calculation of normal value and, as necessary, revise the antidumping duty margins for both the investigated and separate rate respondents; it is further

     **ORDERED** that Elkay Manufacturing Company and Guangdong Dongyuan Kitchenware Industrial Co., Ltd. each may file comments on the Remand Redetermination within thirty (30) days from the date on which the Remand Redetermination is filed with the court; and it is further

     **ORDERED** that defendant may file a response within fifteen (15) days from the date on which the last of any such comments is filed with the court.

                                         /s/Timothy C. Stanceu
                                       Timothy C. Stanceu
                                       Chief Judge

Dated: December 22, 2014
       New York, New York