Slip Op. 16-69

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **ELKAY MANUFACTURING COMPANY**, <br><br> Plaintiff, <br><br> v. <br><br> **UNITED STATES**, <br><br> Defendant, <br><br> and <br><br> **GUANGDONG DONGYUAN KITCHENWARE INDUSTRIAL COMPANY, LTD.**, <br><br> Defendant-intervenor. | **Before: Timothy C. Stanceu, Chief Judge** <br><br> **Consol. Court No. 13-00176** |

## OPINION

Dated: July 14, 2016

[Affirming an agency redetermination in an antidumping duty investigation, submitted in response to a court order]

*Joseph W. Dorn* and *P. Lee Smith*, King & Spalding LLP, of Washington, D.C., for plaintiff and consolidated defendant-intervenor Elkay Manufacturing Company.

*Gregory S. Menegaz* and *J. Kevin Horgan*, deKieffer & Horgan, PLLC, of Washington, D.C., for consolidated plaintiff and defendant-intervenor Guangdong Dongyuan Kitchenware Industrial Company, Ltd.

*Patricia M. McCarthy*, Assistant Director, and *Richard P. Schroeder*, Trial Attorney, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, of Washington, D.C., for defendant United States. With them on the brief were *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director. Of counsel on the brief was *Whitney M. Rolig*, Attorney, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, Washington, D.C.

Stanceu, Chief Judge:  In this consolidated action, plaintiffs Elkay Manufacturing

Company ("Elkay") and Guangdong Dongyuan Kitchenware Industrial Company, Ltd.

("Dongyuan") contested an affirmative determination ("Final Determination") that the

International Trade Administration, U.S. Department of Commerce ("Commerce" or the

"Department") issued upon concluding an antidumping duty investigation of drawn stainless

steel sinks ("subject merchandise") from the People's Republic of China ("China" or the

"PRC").  Both plaintiffs challenged aspects of the Department's calculation of the normal value

of subject merchandise.[1]

Before the court is the Department's decision on remand ("Remand Redetermination")

issued in response to the court's opinion and order in *Elkay Mfg. Co. v. United States*, 38 CIT __,

34 F. Supp. 3d 1369 (2014) ("*Elkay I*").  The court affirms the Remand Redetermination.

## I. BACKGROUND

The court presumes familiarity with the court's opinion in *Elkay I*, *id*.  Below, the court

summarizes that background and addresses developments since the issuance of that opinion.

### A.  The Investigation and the Antidumping Duty Order

In March 2012, Commerce initiated an antidumping duty investigation of imports of

drawn stainless steel sinks ("drawn sinks") from China covering the period of July 1, 2011 to

December 31, 2011.  *Drawn Stainless Steel Sinks From the People's Republic of China:*

*Initiation of Antidumping Duty Investigation,* 77 Fed. Reg. 18,207 (Int'l Trade Admin.

Mar. 27, 2012) ("*Initiation*").  Elkay, a U.S. producer of drawn sinks, was a petitioner in the

investigation.  *See Drawn Stainless Steel Sinks From the People's Republic of China:*

---

[1] Each plaintiff is also a defendant-intervenor in this consolidated action.  Order
(June 28, 2013), ECF No. 16 (Court No. 13-00199) (granting Elkay's Mot. for Intervention);
Order (July 09, 2013), ECF No. 21 (granting Dongyuan's Mot. for Intervention).

*Antidumping Duty Investigation*, 77 Fed. Reg. 60,673 (Int'l Trade Admin. Oct. 4, 2012)

("*Prelim. Determination*"), and accompanying *Decision Memorandum for Preliminary*

*Determination for the Antidumping Duty Investigation of Drawn Stainless Steel Sinks from the*

*People's Republic of China*, A-570-983, at 1 (Sept. 27, 2012) (Admin.R.Doc. No. 337),

*available at* http://enforcement.trade.gov/frn/summary/PRC/2012-24549-1.pdf (last visited

Apr. 19, 2016) ("*Prelim. Decision Mem.*").   Dongyuan, a Chinese producer and exporter of

drawn sinks, was one of two mandatory respondents investigated by the Department.   *See*

*Prelim. Decision Mem.* 5.

     In the Final Determination, Commerce ruled that imports of subject merchandise from

China are being, or are likely to be, sold in the United States at less than fair value and issued an

antidumping duty order assigning weighted-average dumping margins of 27.14% to Dongyuan,

39.87% to the other mandatory respondent, Superte/Zhaoshun,[2] and a simple average of the two

rates, 33.51%, to the "separate rate" respondents, i.e., respondents that demonstrated

independence from the government of the PRC.   *See Drawn Stainless Steel Sinks from the*

*People's Republic of China: Investigation, Final Determination*, 78 Fed. Reg. 13,019, 13,019-23

(Int'l Trade Admin. Feb. 26, 2013) ("*Final Determ.*"); *Drawn Stainless Steel Sinks from the*

*People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and*

---

[2] The other mandatory respondent in the investigation was "a combined entity Commerce identified as consisting of Zhongshan Superte Kitchenware Co., Ltd. ('Superte') and a related invoicing company, Foshan Zhaoshun Trade Co., Ltd. ('Zhaoshun') (collectively identified as 'Superte/Zhaoshun')." *Elkay Mfg. Co. v. United States*, 38 CIT __, __, 34 F. Supp. 3d 1369, 1371 (2014) (citing *Drawn Stainless Steel Sinks from the People's Republic of China: Investigation, Final Determination*, 78 Fed. Reg. 13,019, 13,019 n.2 (Int'l Trade Admin. Feb. 26, 2013)) ("*Elkay I*").

*Antidumping Duty Order*, 78 Fed. Reg. 21,592, (Int'l Trade Admin. Apr. 11, 2013) ("*Amended Final Determ. and Order*").[3]

### B.  The Court's Opinion and Order Remanding the Final Determination

In an action brought in June 2013, Elkay challenged the Department's method of accounting for selling, general, and administrative ("SG&A") expenses in calculating the normal value of the subject merchandise of the two mandatory respondents.  *See* Compl. ¶¶ 11-14 (June 5, 2013), ECF No. 14 ("Elkay Compl."); *Elkay I*, 38 CIT at __, 34 F. Supp. 3d at 1370.

In its separate (now consolidated) action, Dongyuan challenged the Department's use of certain import data from Thailand to determine a surrogate value for cold-rolled stainless steel coil, the primary material used in producing the subject merchandise.  Compl. ¶¶ 11-15 (June 12, 2013), ECF No. 9 (Court No. 13-00199) ("Dongyuan Compl.").  In the Final Determination, Commerce used the Thai import data to calculate a surrogate value of $3.80 per kilogram for this input.  *See Final Results of Redetermination Pursuant to Court Remand* 4-5 (Apr. 22, 2015), ECF No. 64 ("*Remand Redeterm.*").  Defendant requested that the court order a partial voluntary remand that would permit Commerce to reconsider the use of Thai import data for determining a surrogate value for cold-rolled stainless steel coil and to reopen the record to admit additional data.  *Elkay I*, 38 CIT at __, 34 F. Supp. 3d at 1371, 1374.

---

[3] Commerce issued the Amended Final Determination of Sales at Less than Fair Value following a ministerial error allegation filed by one of the separate rate applicants, Jiangxi Zoje Kitchen & Bath Industry Co., Ltd.  *Drawn Stainless Steel Sinks from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 78 Fed. Reg. 21,592, 21,593 (Int'l Trade Admin. Apr. 11, 2013) ("*Amended Final Determ. and Order*").  The change Commerce made in the Amended Final Determination affected only that applicant.  *Id.*

In *Elkay I*, the court granted defendant's request for a partial voluntary remand.  *Id.*, 38 CIT at __, 34 F. Supp. 3d at 1371.  The court also directed Commerce to reconsider its method of accounting for the SG&A expenses.  *Id.*

### C.  Dongyuan's Motion for Reconsideration

Following the court's issuance of the opinion and order in *Elkay I*, Dongyuan moved for reconsideration, alleging various errors by the court.  Consol. Pl. Guangdong Dongyuan Kitchenware R. 59(a) Mot. for Reconsideration (Jan. 21, 2015), ECF No. 55.  The court denied this motion.  *Elkay Mfg. Co. v. United States*, 39 CIT __, Slip Op. 15-33 (Apr. 20, 2015).

### D.  The Remand Redetermination

Commerce issued the Remand Redetermination on April 22, 2015.  *See Remand Redeterm.*  On remand, Commerce made no change to its choice of surrogate value for cold-rolled stainless steel coil, which therefore remained at the $3.80-per-kilogram value Commerce calculated for the Final Determination, *id.* at 4-6, but changed its method of accounting for SG&A expenses, *id.* at 7-10.  The change increased Dongyuan's weighted-average dumping margin from 27.14% to 36.59%, increased Superte/Zhaoshun's weighted-average dumping margin from 39.87% to 50.11%, and increased the margin for the separate rate respondents, which was the simple average of the two rates, from 33.51% to 43.35%.  *See id.* at 25.

Elkay and Dongyuan submitted comments on the Remand Redetermination to the court on June 23, 2015.  Pl.'s Comments on the Remand Redeterm., ECF No. 69 ("Elkay's Comments"); Dongyuan Kitchenware's Comments on Final Results of Remand Redeterm., ECF No. 70 ("Dongyuan's Comments").  Defendant filed a response to these comments on October 15, 2015.  Def.'s Resp. to Comments on Remand Redeterm., ECF No. 77 ("Def.'s Response Comments").  In its comments, Elkay expressed agreement with the Remand

Redetermination.  Elkay's Comments 1-2.  Dongyuan opposes the Remand Redetermination,

objecting both to the Department's surrogate value for stainless steel coil and to the change

Commerce made to the method of accounting for SG&A expenses.  Dongyuan's

Comments 45-46.

## II. DISCUSSION

### A.  Jurisdiction and Standard of Review

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980,

28 U.S.C. § 1581(c), pursuant to which the court reviews actions commenced under

section 516A of the Tariff Act of 1930, as amended (the "Tariff Act"), 19 U.S.C. § 1516a,

including an action contesting a final determination that Commerce issues to conclude an

antidumping duty investigation.[4]  In reviewing a final determination, the court "shall hold

unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial

evidence on the record, or otherwise not in accordance with law . . . ."  19 U.S.C.

§ 1516a(b)(1)(B)(i).  Substantial evidence is evidence that "a reasonable mind might accept as

adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

### B.  Commerce Permissibly Determined the Surrogate Value for Stainless Steel Coil

According to section 773(c)(1) of the Tariff Act, 19 U.S.C. § 1677b(c)(1), Commerce, as

a general matter, is to determine the normal value of subject merchandise from a nonmarket

economy ("NME") country "on the basis of the value of the factors of production utilized in

---

[4] Unless otherwise specified, all statutory citations made herein are to the 2012 edition of the United States Code.  The regulatory citation made herein is to the 2015 edition of the Code of Federal Regulations.

producing the merchandise," plus certain additions.[5]  The statute further states that "the valuation

of the factors of production shall be based on the best available information regarding the values

of such factors in a market economy country or countries considered to be appropriate by the

administering authority."  19 U.S.C. § 1677b(c)(1).  The statute provides that Commerce, "in

valuing factors of production . . . shall utilize, to the extent possible, the prices or costs of factors

of production in one or more market economy countries that are . . . at a level of economic

development comparable to that of the nonmarket economy country, and . . . significant

producers of comparable merchandise."  *Id.* § 1677b(c)(4).

　　During the investigation, Commerce identified Colombia, Indonesia, Peru, the

Philippines, South Africa, Thailand, and Ukraine as countries comparable to China with respect

to economic development.  *Elkay I*, 38 CIT at __, 34 F. Supp. 3d at 1373.  Commerce also found

that all of these countries, except the Philippines, were significant producers of comparable

merchandise.  *Id.*

　　To value cold-rolled stainless steel coil for the Final Determination, Commerce used

import data for Thailand published in the Global Trade Atlas ("GTA"), concluding that these

data were more specific to the input than GTA import data for the Philippines and Indonesia,

which also were on the record.  *Id.*  Commerce calculated a weighted average unit value

("AUV") from import data for six 11-digit Thai harmonized tariff schedule ("HTS") subheadings

under two Thai HTS six-digit subheadings applying to cold-rolled stainless steel coil, subheading

7219.33 (which applies to cold-rolled stainless steel, 600 mm or more in width, of thickness

---

[5] The International Trade Administration, U.S. Department of Commerce, considers
China to be a "nonmarket economy ('NME'), country," a term defined in 19 U.S.C.
§ 1677(18)(A) as "any foreign country that the administering authority determines does not
operate on market principles of cost or pricing structures, so that sales of merchandise in such
country do not reflect the fair value of the merchandise."

exceeding 1 mm and less than 3 mm) and subheading 7219.34 (same, but of a thickness of 0.5

mm or more and not exceeding 1 mm).  *See Remand Redeterm.* 2.  Commerce found that the

Thai import data in the six 11-digit subheadings "are specific to the types, finishes, and grades of

stainless steel coil Dongyuan consumed in the production of the subject merchandise."  *Id.* at 5

(footnote omitted).  Commerce excluded from its AUV calculation the Thai imports that were

from nonmarket economy countries, the Thai imports for which the source country was

unspecified, the Thai imports from the various countries that Commerce found to maintain

broadly available subsidies, and the Thai imports from the countries upon which Thailand

imposed antidumping duties, which were Japan and Taiwan.  *See id.* at 3 n.11.  The result of the

Department's calculation in the Final Determination was the aforementioned surrogate value of

$3.80 per kilogram.  *Id.* at 4.

      In contesting the Final Determination, Dongyuan raised various objections to the

suitability and reliability of the Thai import data, arguing that Commerce should have valued the

stainless steel coil input using Global Trade Atlas import data for the Philippines and Indonesia.

*Elkay I*, 38 CIT at __, 34 F. Supp. 3d at 1374 (citation omitted).  In response to Dongyuan's

claim, defendant requested a voluntary remand to place on the record import data on cold-rolled

stainless steel coil for the potential surrogate countries for which import data were not already on

the record, so that Commerce could determine whether the Thai import data were aberrational.

*Id.*  The court granted this voluntary remand request over Dongyuan's objection.  *Id.*

      On remand, Commerce added to the record GTA import data pertaining to Colombia,

Peru, South Africa, and Ukraine for imports of cold-rolled stainless steel made under the two six-

digit harmonized system subheadings, 7219.33 and 7219.34.  *Remand Redeterm.* 3.  Commerce

then compared the average unit values shown in the Thai import data and the AUVs obtained

from import data for the other six countries (i.e., Colombia, Indonesia, Peru, Philippines, South

Africa, and Ukraine).  *Id.* at 3-4.  Before making the comparison, Commerce excluded data on

imports into these countries from nonmarket economy countries, imports from countries that

maintain generally available export subsidies, and imports for which the source country was

unspecified.  *Id.* at 3 n.11.  Commerce noted that the AUV it calculated for Thailand for the

purpose of the comparison, $2.65 per kg., was within the range of the AUVs for the other six

countries (Colombia, $2.81; Indonesia, $2.10; Peru, $3.08; Philippines, $2.70; South Africa,

$3.21; Ukraine, $3.15).  *Id.* at 3-4.  The quantity on which the Thai imports were based,

34,415,219 kg., was considerably larger than each of the import quantities for the other six

countries (with the next highest quantity being the imports into Colombia, which were

11,663,084 kg.).  *Id.*  Commerce concluded in the Remand Redetermination that the Thai import

data were not aberrational.  *Id.* at 13-21.  In opposing the Remand Redetermination, Dongyuan

challenges this finding and maintains that the Department's chosen surrogate value, $3.80 per

kg., is unsupported by substantial record evidence.  Dongyuan's Comments 2-19.

In response to Dongyuan's comments opposing the Remand Redetermination, the court

has considered the record import data, the reasoning Commerce presented in the Remand

Redetermination, and Dongyuan's arguments as to why the surrogate value Commerce applied to

cold-rolled stainless steel coil was not based on the best available information.  The court

concludes that the surrogate value must be sustained upon judicial review.  Commerce

determined, based on record evidence, that the Thai import data it used in the Final

Determination to calculate the surrogate value of $3.80 per kilogram were more specific to the

type of cold-rolled stainless steel Dongyuan used to make the subject merchandise than were any

competing data on the record.  Dongyuan does not contest this particular finding.  Although the

Thai data were subject to certain shortcomings, as discussed herein, Commerce nevertheless

acted within its discretion in choosing the Thai data as the "best available information."

Dongyuan directs its first set of arguments to the amount by which the surrogate value

exceeds the values shown in import data from the other potential surrogate countries and to the

relatively small quantity upon which the surrogate value is based. Dongyuan submits that the

Department's comparison of the quantity and value of Thai imports with data from the other six

countries "is misleading and incomplete" because the Thai data include "all of the dumped

imports into Thailand." *Id.* at 3. Dongyuan points out that when the dumped imports, i.e., the

imports into Thailand from Japan and Taiwan, are excluded from the total Thai imports, the

quantity of Thai imports is reduced from 34,415,219 kg. to 2,786,140 kg. and the AUV is

increased from $2.65 per kg. to $3.61 per kg., a value Dongyuan characterizes as "not 'in range'"

when compared to the AUVs for the other six countries. *Id.* at 4. According to Dongyuan, "the

Thai AUV data for this commodity steel that can be acquired anywhere in the world is aberrant

because it is far above the AUVs for the other countries, particularly for a commodity." *Id.* at 6.

The court is not persuaded by Dongyuan's argument that the AUV derived from the Thai

data was aberrant when compared to the AUVs for the other six countries. The $3.61 per kg.

AUV for non-dumped Thai imports is higher than the other six values (in descending order,

$3.21, $3.15, $3.08, $2.81, $2.70, and $2.10), but it is not so substantially higher as to be

"aberrant." As Commerce pointed out (in responding to the argument as made by Dongyuan in

response to a draft version of the remand redetermination), "substantial variations exist from

country to country within those 6-digit AUVs, ranging from as low as two percent (between

South Africa and Ukraine) to as high as 52 percent (between Indonesia and South Africa)."

*Remand Redeterm.* 15. Moreover, the quantity upon which the $3.61 per kg. AUV was derived,

2,786,140 kg., is within the range of the quantities upon which the other six AUVs were based, being higher than the lowest quantity (2,254,584 kg. for South Africa). *Id.* at 14.

Dongyuan argues that the AUV Commerce actually used to value the input, $3.80 per kg., was based on an aberrantly small quantity, 374,737 kg. Dongyuan's Comments 5 ("This is less than 1% of the 6-digit HTS import totals into all six countries and 15 times smaller than the average import quantity into each country."). Dongyuan views the amount as derived from only four of the six Thai 11-digit subheadings and from individual shipment quantities that were too small to be representative of Dongyuan's purchases, which were much larger, totaling in the aggregate nearly 2 million kilograms during the period of investigation. *Id.* at 8-9. The court rejects this argument as well. Dongyuan has not shown that the 347,737 kg. quantity is so small as to be commercially insignificant, and comparing this quantity with the larger 6-digit quantities is not meaningful because the import data associated with the 347,737 kg. quantity are the only import data on the record—from any country—that Commerce found to be "specific to the types, finishes, and grades of stainless steel coil Dongyuan consumed in the production of the subject merchandise." *Remand Redeterm.* 5 (footnote omitted).

Specifically, Commerce found that "Dongyuan uses stainless steel coil grade 304," an "austenitic grade stainless steel."[6] *Id.* at 5 n.20 (citations omitted). In support of its continuing to value the stainless steel coil input using the 11-digit Thai import data, Commerce stated in the Remand Redetermination that "[i]t is the Department's preference to select data for an input that is specific to the input consumed by a respondent for purposes of calculating surrogate values."

---

[6] Commerce explained that "[r]ecord evidence shows that there are several grades of stainless steel coil, including martensitic, ferritic, austenitic ferritic, austenitic, and precipitation hardening, and each grade includes a variety of finishes and chemical compositions." *Final Results of Redetermination Pursuant to Court Remand* 4 (Apr. 22, 2015), ECF No. 64 ("*Remand Redeterm.*").

*Id.* at 5 (footnote omitted).  Commerce found that the import data for Colombia, Indonesia, Peru,

the Philippines, and South Africa were available only at the level of six-digit subheadings and

"do not make any distinction for grade of stainless steel coil." *Id.* at 5-6.  It added that "Ukraine

reports import data under 10-digit HTS subcategories for stainless steel coil; however, the

Department cannot discern from the descriptions of those categories whether those subcategories

are of the same or similar grade [as] the stainless steel coil that Dongyuan consumed." *Id.* at 6

(footnote omitted).  In its comments on the Remand Redetermination, Dongyuan did not contest

the findings by Commerce that pertained to the relative specificity of the 11-digit Thai

subheadings.  It was reasonable for Commerce to prefer data that has greater specificity to the

input it is valuing, even where, as here, those data pertain to a smaller (but not insignificant)

quantity than do the more general import data on cold-rolled stainless steel coil.  That Dongyuan

purchased stainless steel coil in quantities larger than those on which the surrogate value was

based does not negate another critical, and uncontested, fact: of all the data on the record, only

the Thai import data contained breakouts that Commerce could relate to the grade of steel

Dongyuan used in making the subject merchandise.

Dongyuan argues, further, that the Thai import statistics were not the best available

information upon which to base a surrogate value because "[t]he dominance of the Thai imports

by non-market, subsidized, and dumped imports necessarily affects the pricing of the fairly

traded steel in Thailand, rendering the GTA data unreliable and unrepresentative."  Dongyuan's

Comments 11.  Dongyuan maintains that Commerce excluded the vast majority of Thai import

trade data (a percentage Dongyuan describes, variously, as 92%, *id.* at 5, and as 93% or 94%, *id.*

at 12) "because of dumping orders, export subsidies, or government involvement in the country

of export (i.e., NME [non-market economy] status of the exporting country)."  *Id.*  Dongyuan

draws the conclusion that the remaining 6-8% was not the "best available information" within

the meaning of 19 U.S.C. § 1677b(c)(1) because "[i]n comparison" the Philippine and

Indonesian import data "do not evidence pervasive market distortion." *Id.*

Dongyuan's contention that the Thai import data Commerce did not exclude are so

pervasively distorted as to be unreliable (and therefore inferior to the Philippine and Indonesian

import data) rests on speculation rather than record evidence.  In attributing the distortions

inherent in the data Commerce excluded to the data Commerce did not exclude, Dongyuan fails

to present an argument grounded in record evidence.  Faced with imperfect sets of data,

Commerce permissibly chose the Thai data, concluding that "the Indonesian and Philippine data

for stainless steel coil do not constitute the best information available to value stainless steel coil

because the data from those countries were only available at the 6-digit HTS level and do not

make any distinction for grade of stainless steel coil." *Remand Redeterm.* 5.

Further to its argument that the Thai import data are distorted, Dongyuan contends that

the domestic Thai market for cold-rolled steel coil is distorted by government subsidies provided

to POSCO Thainox ("POSCO"), which produces stainless steel in Thailand.  Dongyuan's

Comments 14-19.  Dongyuan submits that POSCO is the only manufacturer and distributor of

cold-rolled stainless steel coil in Thailand and that it received both generally available export

subsidies and specific subsidies under Thailand's Investment Promotion Act ("IPA") for "the

business relating to the manufacturing of cold-rolled stainless steel." *Id.* at 15.  Dongyuan

objects that Commerce failed to follow its policy of disregarding prices that it has "reason to

believe or suspect" are subsidized. *Id.* at 16.  For evidence of the distortion of the domestic

stainless steel market, Dongyuan relies on a 2011 POSCO financial statement disclosing that

under the IPA "'the Company was granted certain promotional privileges in the business relating

to the manufacturing of cold-rolled stainless steel' . . . including the 'exemption from import

duty on imported machinery and equipment' which the Department has found countervailable."

Dongyuan's Comments 15-16 (citing 2011 POSCO Annual Report) (footnote omitted).

Commerce did not consider the POSCO financial statement to be sufficient record

evidence upon which it could conclude "that the cold-rolled steel market in Thailand as a whole

is distorted because of this subsidization." *Remand Redeterm.* 17.  Although acknowledging in

the Remand Redetermination that "we found sections of the IPA to be countervailable in a

previous determination," Commerce noted that "we never initiated a countervailing duty

investigation of POSCO itself, nor have we made a determination that POSCO is a public

authority whose presence in the cold-rolled steel market is so dominant that it distorts import

prices into Thailand." *Id.* (citing *Certain Frozen Warmwater Shrimp From Thailand; Final

Negative Countervailing Duty Determination*, 78 Fed. Reg. 50,379 (Aug. 19, 2013)).  Commerce

also stated that it had "never made a determination that the Thai government owns or controls the

majority or a substantial portion of the market for cold-rolled stainless steel via POSCO or any

other entity." *Id.* at 18.

The court rejects the argument Dongyuan bases on the POSCO financial statement.

Despite the record evidence that POSCO received one or more government subsidies, Commerce

still could conclude based on the record evidence that the Thai market as a whole was not so

distorted by the subsidization that data on the value of *imports* into Thailand were unsuitable for

use in determining the surrogate value.  Dongyuan validly points out that Commerce generally

declines to use surrogate value data based on prices it suspects are subsidized, but Dongyuan has

not demonstrated that Commerce ignored record evidence compelling a conclusion that these

import values were distorted by the government subsidies such that they did not qualify as the best available information for valuing the stainless steel coil.

Dongyuan argues that the values reflected in the Thai import data are unreliable because Thai customs officials "regularly impose[] arbitrarily high Customs values to its imports, thereby . . . . increasing the prices published in its import data." Dongyuan's Comments 29. Dongyuan cites a report of the United States Trade Representative stating that the Thai "Customs Department Director General retains the authority and discretion to arbitrarily increase the customs value of imports." *Id.* at 30 (citation omitted). It also cites a FedEx Country Report stating that Thai Customs use the "highest declared price of products imported" to "establish and distribute the indicative price of some products" and that "this indicative price will be used instead of the transaction value to determine the custom value," which "could happen across all sectors" when customs officials "are concerned about the accuracy of the price declared on the invoice." *Id.* at 31 (citation omitted). Concluding that that these reports of manipulation of customs values by the Thai government did not "address any of the raw material inputs that are consumed by the respondents," Commerce considered the record evidence insufficient to support a conclusion that "the steel input data relied on in this investigation was subject to the manipulation alleged." *Remand Redeterm.* 19.

The evidence of manipulation was relevant to the question of the reliability of the Thai data, but, as Commerce concluded, it does not establish that Thai Customs import values are affected generally, and significantly, by the practice the U.S. Trade Representative identified. The record evidence of manipulation of customs values does not rise to such a level that Commerce was left with no choice but to foreclose *any* use of Thai import data to determine a surrogate value for a production input. As the court discussed previously, Commerce must make

selections from among imperfect data sets.  On this record, Commerce was faced with the need

to weigh the superior specificity of the Thai import data (as compared to other record import

data) against other factors, as it did here.  The record, considered as a whole, contained

substantial evidence to support the Department's finding that the Thai import data were the best

available information.

C.  The Method Commerce Applied to Value SG&A Expenses In the Remand Redetermination
Was Not Contrary to Law

In determining normal value according to Section 773(c)(1) of the Tariff Act, Commerce

includes among the factors of production the hours of labor required to produce the subject

merchandise.  19 U.S.C. § 1677b(c)(3)(A) ("[T]he factors of production utilized in producing

merchandise include, but are not limited to . . . hours of labor required . . . .").  The statute further

provides that Commerce, after calculating the total value of the factors of production (including

labor), is to add "an amount for general expenses and profit plus the cost of containers,

coverings, and other expenses."  *Id.* § 1677b(c)(1).  In this litigation, Elkay claimed that the

Department's method of determining the normal value of the subject merchandise of the two

mandatory respondents did not capture the value of the labor component of these respondents'

selling, general and administrative expenses, i.e., the "SG&A labor."  *See Elkay I*, 38 CIT at __,

34 F. Supp. 3d at 1376.

Commerce typically calculates surrogate values for factory overhead expenses, for

SG&A and interest expenses, and for profit, by calculating and applying "financial ratios"

derived from the financial statements of one or more producers of comparable merchandise in

the primary surrogate country.  *See* 19 C.F.R. § 351.408(c)(4).  For the Final Determination,

Commerce calculated surrogate SG&A expenses for the two mandatory respondents by using

information obtained from the financial statements of three Thai companies (Stainless Steel

Home Equipment Manufacturing Co., Ltd, Diamond Brand Co., Ltd., and Advance Stainless

Steel Co., Ltd.).  *Elkay I*, 38 CIT at __, 34 F. Supp. 3d at 1377.  From these three financial

statements, Commerce calculated separate ratios for each Thai company that represented an

SG&A expense combined with interest expense, and then averaged the three ratios to derive a

single SG&A/interest expense ratio for use in determining the normal value of the subject

merchandise of the two investigated respondents.[7]  *Id.*

> 1.  Commerce Permissibly Calculated an SG&A/Interest Expense Ratio Using All Financial
> Statement Data on SG&A Expenses

   In deriving an average SG&A/interest expense ratio for the Final Determination,

Commerce adjusted the individual ratios to exclude certain expenses that it considered to

represent a labor cost component of the reported SG&A expenses.[8]  *Id.*; *see Remand*

*Redeterm.* 6-7 (explaining that in the Final Determination " . . . the Department excluded certain

labor costs identified in the three surrogate financial statements as 'SG&A labor costs' from the

numerators of the SG&A ratios and included those costs in the denominators of those ratios to

avoid double-counting those costs in the calculation of normal value ('NV').") (footnote

omitted).  Regarding "double counting," Commerce considered the rate by which it valued the

hours of labor as a factor of production to include already the labor associated with SG&A

---

[7] Commerce calculates the SG&A/interest expense ratio as the sum of all SG&A and interest expenses (numerator) divided by the sum of all materials, labor, energy, and factory overhead expenses (denominator).  *See Antidumping Manual*, Ch. 10 at 18 (Intl. Trade Admin. 2009); *see Factor Valuations for the Final Determination*, Attach. 1 (final surrogate value worksheets) (Feb. 19, 2013) (Admin.R.Doc. No. 422) ("*Final Factor Valuations Mem.*").

[8] The financial statements of all three Thai companies reported certain labor costs separately from production labor costs, itemizing these non-production labor costs as sales or administrative expenses.  *See Remand Redeterm.* 8 & 8 n.37 (citing *Pet'r's Submission of Surrogate Values*, Ex. 10 (Aug. 13, 2012) (Admin.R.Doc. No. 262) (including financial statements of Stainless Steel Home Equipment Manufacturing Co., Ltd. and Diamond Brand Co., Ltd.); *Dongyuan's Rebuttal Surrogate Values for the Prelim. Results*, Ex. 5 (Aug. 20, 2012) (Admin.R.Doc. No. 296) (including financial statement of Advance Stainless Steel Co., Ltd.)).

functions as well as manufacturing labor.  *Elkay I*, 38 CIT at __, 34 F. Supp. 3d at 1379.

Commerce had obtained that rate from "data on the labor cost of '[m]anufacture of other

fabricated metal products not enumerated elsewhere' contained in the 'Industrial Census 2007'

published by Thailand's National Statistics Office ('NSO')."  *Id.*, 38 CIT at __, 34 F. Supp. 3d

at 1378 (citation omitted).  Commerce considered this "NSO" labor rate to be more product-

specific and more contemporaneous than other record data on labor rates and, therefore, the best

available information for valuing labor hours.  *Id.*  In addition to the NSO data, the record

contained 2005 data from Chapter 6A of the International Labor Organization ("ILO") Yearbook

of Labor Statistics, which Commerce had used to value the mandatory respondents' hours of

manufacturing labor in the Preliminary Results.  *See id.*

      In *Elkay I*, the court invalidated, as unsupported by substantial record evidence, the

Department's determination that the specific downward adjustments Commerce made to the

SG&A/interest expense ratios were justifiable as a compensation for "double-counting" of

SG&A labor expenses.  *Id.*, 38 CIT at __, 34 F. Supp. 3d at 1380-82.  The court held that "[t]he

record lacks substantial evidence to support the Department's conclusion that the rate Commerce

applied to the hours of production labor reported by the investigated respondents overstated the

value of those labor hours to such an extent as to justify the specific, compensatory adjustments

that Commerce made to the SG&A/interest expense ratios."  *Id.*, 38 CIT at __, 34 F. Supp. 3d

at 1382.  The court reasoned that "[o]n this administrative record, the Department's reliance on

the extent of any 'double-counting' was too much a matter of speculation."  *Id.* (citation

omitted).

      Reconsidering its decision on remand, Commerce recalculated the SG&A ratios to delete

the "double counting" adjustment.  Commerce concluded that it had "erroneously" removed

SG&A labor expenses from the calculation of the SG&A financial ratios.  *Remand Redeterm.* 22.

Commerce explained that "[n]otwithstanding that the record shows that the NSO labor rate was

derived from an average remuneration paid for persons engaged in various manufacturing and

non-manufacturing activities, it does not follow that the labor expenses calculated using the NSO

labor rate capture all labor expenses."  *Id.* at 8.  Commerce further explained that "[t]his is

because under the factors of production ('FOP') methodology for calculating NV, labor expenses

capture the labor cost only for manufacturing—obtained by multiplying a respondent's reported

direct and indirect labor hours to manufacture subject merchandise by the surrogate labor rate

(*e.g.*, the NSO labor rate or the ILO Chapter 6A labor rate)."  *Id.*  Commerce noted that "[t]he

respondents did not report labor hours associated with the selling and administrative staff" and,

as the court held in *Elkay I*, "there is not substantial evidence to find that the NSO labor rate is

high enough to compensate for those unreported hours."  *Id.* at 8-9.  Rather than presume that the

NSO labor rate it applied to hours of labor indirectly captured the SG&A expense (as Commerce

appeared to have done in the Final Determination), Commerce stated in the Remand

Redetermination that it had decided to "treat the SG&A labor costs as SG&A expenses in each

company's surrogate financial ratio calculation."  *Id.* at 10 (footnote omitted.).  Commerce cited

the fact that in all three of the Thai companies' financial statements, which Commerce used to

calculate the SG&A expense ratios, "the salary for selling and administrative staff and/or welfare

benefits were unambiguously classified under a separate section (*e.g.*, selling and administrative

expenses) from the cost-of-production or cost-of-good[s]-sold section (which included labor

costs)," *id.* at 8, and "it is the Department's practice to treat labor in its financial ratio

calculations in the same manner the surrogate company disaggregates its labor costs," *id.* at 9.

The court sustains the Department's valuation of SG&A expenses in the Remand Redetermination.  The record evidence supports the Department's finding that the method used in the Final Determination applied a surrogate labor rate only to hours of direct and indirect manufacturing labor, not SG&A labor.  Therefore, the labor component of the SG&A expenses could have been included within the normal value calculation only indirectly, through a surrogate labor rate that overstated the value of manufacturing labor as a means of compensation.  But as the court concluded in *Elkay I*, and as Commerce implicitly acknowledges in the Remand Redetermination, the record does not contain substantial evidence supporting a finding that the rate Commerce used to value the manufacturing labor is overstated in such a way as to effect a defensible compensation for this omission.  The recalculation Commerce made upon remand, which determined an SG&A/interest expense ratio based on the full reported SG&A expenses of the three Thai producers, corrects the error the court identified in *Elkay I*.

Dongyuan opposes the Department's decision on remand, arguing that the Department's recalculation "contains both the value of SG&A labor in the labor rate and the value of SG&A labor in the financial ratios" and thus "SG&A labor is being double-counted."  Dongyuan's Comments 40.  Dongyuan offers two reasons why it believes the Department failed to make an adjustment necessary to avoid the double counting of non-production labor expenses.

First, Dongyuan argues that the NSO 2007 labor rate unquestionably is higher than it would be had it been based solely on production labor.  *Id.* at 38-40.  Dongyuan submits that the court, and the Department on remand, were incorrect to "doubt the double-counting of SG&A labor because it cannot be exactly quantified."  *Id.* at 41.  Dongyuan argues, further, that the amount of double counting is equivalent to the "cost of the non-production labor," which is quantified in the "disaggregated labor costs in the financial statements."  *Id.* at 41-42.  The

premise of this argument is not supported by the evidence of record.  In the Remand

Redetermination, Commerce did not base its decision to refrain from making an adjustment to

the SG&A ratio on a finding that the NSO labor rate would be no higher were it based solely on

manufacturing labor.  Indeed, there was no way for Commerce to determine from the record

what an NSO labor rate would have been had the basis for the rate been limited in that way.[9]

Instead, Commerce found on remand that record evidence did not allow it to conclude that it

could capture adequately the cost of SG&A labor by applying the NSO labor rate to production

labor (and only to production labor), as a substitute for including the full reported SG&A costs in

the SG&A/interest expense financial ratio.  This finding was central to the Department's decision

on remand not to make the adjustment Dongyuan advocates, and the court, therefore, must

consider whether the finding is a valid one.  The court concludes that the finding is supported by

substantial evidence on the record.  That evidence included, significantly, the evidence that the

three Thai companies separately reported certain labor expenses that are associated with SG&A

functions and that the Department's methodology applied the surrogate labor rate only to hours

of manufacturing labor.

Second, Dongyuan argues that in failing to make an adjustment to avoid double counting,

Commerce acted contrary to the policy announced in its 2011 "*Labor Methodologies*" notice.  *Id.*

at 42-44.  In the notice Dongyuan cites, Commerce announced a change in its methodology in

which it would value hours of labor using ILO Chapter 6A data, which Commerce considered to

---

[9] As the court concluded in *Elkay I*, "[t]he record data . . . do not support an actual finding that the NSO labor rate was higher—or by what percentage it was higher—than it would have been had it been derived solely from Thai data on production labor rather than from a combination of Thai data on production labor and various types of non-production labor." *Elkay I*, 38 CIT at __, 34 F. Supp. 3d at 1382.  Commerce specifically expressed its agreement with this conclusion in the Remand Redetermination.  *Remand Redeterm.* 10.

reflect all costs related to labor "including wages, benefits, housing, training, etc.," instead of

ILO Chapter 5B data, which "reflects only direct compensation and bonuses." *Antidumping*

*Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of*

*Production*: *Labor*, 76 Fed. Reg. 36,092, 36,093 (Int'l Trade Admin. June 21, 2011) ("*Labor*

*Methodologies*").  To address concerns that this change could result in overstating labor costs,

the notice states that "the Department will adjust the surrogate financial ratios when the available

record information – in the form of itemized indirect labor costs – demonstrates that labor costs

are overstated." *Id.*, 76 Fed. Reg. at 36,093-94.  The notice further states that "[s]pecifically,

when the surrogate financial statements include disaggregated overhead and selling, general, and

administrative expense items that are already included in the ILO's definition of Chapter 6A

data, the Department will remove these identifiable costs items." *Id.*, 76 Fed. Reg. at 36,094.

Dongyuan argues that Commerce must follow the policy it established in *Labor*

*Methodologies* in this case by removing the disaggregated SG&A labor expenses identified in

the surrogate financial statements from the SG&A/interest expense ratio.  Dongyuan's

Comments 44.  This argument is unpersuasive because the adjustment contemplated in the *Labor*

*Methodologies* notice is made when Commerce uses the ILO Chapter 6A data, which Commerce

did not do here, deciding instead to use a source that resulted in application of a much lower

labor rate than one obtained from ILO Chapter 6A data.  *See Elkay I*, 38 CIT at __, 34 F.

Supp. 3d at 1383-84.  As the court stated in *Elkay I*, "[t]he notice creates 'the rebuttable

presumption that Chapter 6A data better accounts all direct and indirect labor costs.'" *Id.*,

38 CIT at __, 34 F. Supp. 3d at 1383 (quoting *Labor Methodologies*, 76 Fed. Reg. at 36,093).

As the court observed in *Elkay I*, "Commerce departed from the methodology announced in the

notice by rejecting the ILO Chapter 6A data in the Final Determination in favor of the NSO

data . . . ." *Id*. Dongyuan, understandably, does not argue that Commerce was obligated to

achieve consistency with the *Labor Methodologies* notice by reverting to the ILO Chapter 6A

data, which it used to value labor hours in the Preliminary Results.

<u>2.  Commerce Acted within its Discretion in Declining to Reopen the Record to Admit<br>Additional Surrogate Data for Valuing Labor Hours</u>

Finally, Dongyuan argues that if Commerce cannot or will not make an adjustment to

eliminate double counting by removing SG&A labor expenses from the SG&A/interest expense

ratio, "the Department must changes [*sic*] its labor source and methodology" for determining

labor expenses.  Dongyuan's Comments 44.  Dongyuan adds that it "has suggested returning to

ILO [Chapter] 5B data, which only covers production labor."  *Id.* at 45.

The court disagrees that Commerce must change its source of data for valuing labor

hours.  The court previously ordered a remand that allowed Commerce to consider "alternative

data sources with which to value the labor hours reported by the two investigated respondents."

*Elkay I*, 38 CIT at __, 34 F. Supp. 3d at 1385.  In the Preliminary Determination, Commerce

preliminarily chose to value labor using ILO Chapter 6A data.  *Issues & Decision Mem. for the*

*Final Determination in the Antidumping Duty Investigation of Drawn Stainless Steel Sinks from*

*the People's Republic of China*, A-570-983, at 11 (Feb. 19, 2013) (Admin.R.Doc. No. 417),

*available at* http://enforcement.trade.gov/frn/summary/PRC/2013-04379-1.pdf (last visited

Apr. 19, 2016).  Following the Preliminary Determination, Dongyuan placed on the record labor

costs from the NSO data.  *Id.*  In the Final Determination, Commerce determined that the NSO

data were the best available information on the record to value labor because they were more

product-specific, were more contemporaneous, and represented a broader market average than

the alternative ILO Chapter 6A data.  *Id.* at 12-14.

Although derived from data on the value of non-production labor as well as production labor, the NSO data, unlike ILO data, are specific to fabrication of metal products. *See Elkay I*, 38 CIT at __, 34 F. Supp. 3d at 1381 (citing *Dongyuan's Final Surrogate Value Submission*, Ex. SV-2 (containing the NSO's description of its methodology and definitions)).  In the Remand Redetermination, Commerce explained that the ILO Chapter 5B data undercount manufacturing labor expenses because they reflect "only direct compensation and bonuses" and not "indirect labor costs items (such as employee pension benefits and worker training)." *Remand Redeterm.* 22.

Moreover, the ILO Chapter 5B data are not on the record of the investigation, no party having submitted them for the Department's consideration.  Dongyuan submitted the NSO 2007 data as a possible substitute for the ILO Chapter 6A data, which Commerce used for the Preliminary Results and which are less favorable to Dongyuan's position than are the NSO data. Not having submitted the ILO Chapter 5B data for the record during the investigation, Dongyuan is in a difficult position in advocating the use of these data on remand.

Ordinarily, the decision of whether or not to reopen a record following an order remanding an agency decision is a matter within the agency's discretion.  *See Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012).  Following the court's remand order, the Department determined that it accurately could calculate respondents' labor costs using the NSO labor rate and that it was unnecessary to consider using ILO Chapter 5B data, which are not on the record, to value labor.  *Remand Redeterm.* 24.  Commerce has the discretion to reopen or not reopen the record in the circumstances presented here.  *Essar Steel*, 678 F.3d at 1278 ("The decision to reopen the record is best left to the agency, in this case Commerce.").  Because the selection of the NSO data as the best available information on the current record is supported by

substantial evidence, and because the data source advocated by Dongyuan is not on that record,

the court declines to disturb the exercise of the Department's discretion not to reopen the record

for admission of another source of data for valuing manufacturing labor, such as the ILO Chapter

5B data.

### III. CONCLUSION

For the reasons discussed in the foregoing, the court affirms the decision on remand

entitled *Final Results of Redetermination Pursuant to Court Remand* (Apr. 22, 2015), ECF

No. 64.  The court will enter judgment accordingly.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Chief Judge

Dated:  July 14, 2016
      New York, New York